### THE BANES.

(Circuit Court of Appeals, Second Circuit. May 24, 1906.)

No. 264.

1. SALVAGE—AMOUNT OF COMPENSATION—UNNECESSARY ATTACHMENT.

Where libelant, who had rendered a salvage service to a steamer, seized her cargo on attachment and caused a considerable loss to the owners, although the shipowner offered to give security for the full amount of any claim against it, a reduction of the salvage award on that account by the trial court will not be disturbed on appeal.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage. § 64.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

Appeal from the District Court of the United States for the Southern District of New York.

The following is the opinion of HOLT, District Judge, in the court below:

I was very favorably impressed with the evidence of Mr. Bacon. I think it is natural that he should think that the Merritt & Chapman Company intruded itself in this matter after it knew that it ought not to do so. No salvage should be allowed to a vessel that goes, against the deliberate wishes of the owner or master, and insists on rendering service against the will of those in command of the vessel. On the other hand, it is important that genuine salvage services should be liberally recognized. The practice should be encouraged of any vessels in the neighborhood starting immediately to rescue another vessel without awaiting detailed instructions. I think the existence of this system of the Merritt & Chapman Wrecking Company having vessels at various points, and having arrangements for quick communication of any disaster, is itself a thing which should be encouraged.

The evidence shows in this case, in my opinion, that the Merritt & Chapman Company had sent orders for their vessel to go, before they knew what the stranded steamer was, and that the Coley had gone. Then, after learning what vessel it was that had stranded, they applied to Mr. Bacon. The evidence is somewhat conflicting as to whether they offered to send their vessel or said they had sent it. As to that I do not think it is very important. Mr. Bacon wanted to know if they would make a fixed charge, instead of leaving it a matter of salvage computation. They declined to do that, and he then said he did not want the tug. But the tug had started, and it is claimed that word should have been sent or some effort made to stop it. In the first place, it is rather doubtful if they could have stopped it, and I think their explanation is quite plausible that they felt it wouldn't be of any use

to try. But I am not sure that, under the circumstances, they were bound to do that. As the afternoon wore on the situation down there was a good deal worse. The tug had started out. I do not see any objection to its going up and offering assistance, and if the captain of the Banes thought he needed it, particularly if the circumstances had changed, it seems to me he ought to have power to retain their services, notwithstanding the original declination of the owner, unless he could get into communication promptly with the owner, without any danger in the meantime to the vessel. At all events the tug went there, and the captain of the Banes supposed that that was the one that had been sent by the owner to get them off. The Coley got out its anchors and got ready to work at high tide, but had not done any more than to get ready. Mr. Bacon got down there about 8 o'clock. I do not understand that the Merritt tug had done anything up to that time except to get ready to work. Mr. Bacon got there at 8 o'clock, and I think the evidence is pretty striking that in the course of that afternoon and up to that time the condi-. tion of things had changed. It was pretty serious. The entries in the log show that the vessel was pounding and was listing to starboard, and the evidence is that the wind was fresh and rising. It was blowing pretty stiff, and there was a heavy roll of the sea in there. Under these circumstances, from the fact that when Mr. Bacon got there, having supposed up to that time, as I understand it, that no Merritt boat had gone there, he made no demand that they leave the steamer and allow him to do the salving, it seems to me that the natural inference to be drawn is that he found things out there worse than he thought they would be when he was in New York, and he concluded, upon the whole, in view of all the circumstances of the case, that he had better let the Merritt boat undertake to do the work, rather than to dismiss it and undertake to do it himself. Undoubtedly, he says, and the captain says, that they thought it would not be of any use to order them away. But I think he should have said, "I gave notice to your owners that I didn't want you, and I demand that you leave and I will save my ship." He was right there, and no such notice was given. He, through the captain of the tug, talked with the captain of the Merritt tug a while about various things, and finally left and went back to New York. I think he decided then that he would leave the salving of that ship to the Merritt Company. I think, under those circumstances, that he in legal effect ratified the consent of his captain to accept the aid of the Merritt tug.

The question is, how much should be allowed. I do not think a very large allowance should be made. There was no danger here to the men or the vessel that was engaged in the work of rescue. They had practically no distance to go. The ship itself, as it turned out, was not in much danger and the men on it were in no danger. But as the afternoon wore on, down to 8 or 9 o'clock, and even down to the time she was got off, it was pretty squally and looked as though it might get worse. The steamer was lying on that part of the keel which was right under the engines. If she pounded much there was danger of a leak there, and of a displacement of some part of her boilers or machinery. But after all, as it turned out, she was not in much danger, and I think that not more than about 5 per cent. should be allowed in this case, or say $2,000. I think the valuation of the steamer should be $36,000 and of the cargo $6,000. As to the point Mr. Kneeland has raised of the action brought by Mr. Benedict, I think that Mr. Benedict is quite free from any criticism. I think, however, that the Merritt & Chapman people ought to have taken into consideration before seizing the property that it was a peculiar cargo of a perishable kind, and to have sent around to make some inquiry to see if the insurance companies would not give a guarantee to avoid the necessity of a seizure and a stoppage of this auction sale. I do not wish to be understood as censuring them very severely. I think they were a little piqued undoubtedly. If this had been a general cargo consigned to a great lot of consignees that would have been quite a different thing, but I think, if they had made a little inquiry or investigation, they would have found out that this cargo was represented by the insurance companies and that they would have obtained a guaranty without an attachment, and saved the owners of the cargo considerable loss.

147 F.—13

· I think, in view of that fact, there should be some diminution of the amount allowed. I think it should be reduced to say $1,600, to be divided in the proportion of $36,000 to $6,000 between the steamship company and the owners of the cargo.

E. G. Benedict, for appellant.
C. S. Haight, for The Banes.
Lawrence Kneeland, for the cargo.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

PER CURIAM. Although not prepared to hold that the libelant should be mulcted, because it attached a disappearing cargo, nevertheless, in view of the circumstance that the shipowner disclosed the situation of the cargo and promptly offered to give security for the full amount of any claim against it, we concur fully in the conclusion of the district judge, and affirm the decree without interest, pending appeal, and with a single bill·of costs in this court to the appellees.

See N. Y. & Cuba Mail S. S. Co. v. The Express, 59 Fed. 476, 8 C. C. A. 182.